Filed 4/11/25  P. v. Herns CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LEE ANDREW HERNS,<br><br>    Defendant and Appellant. | F086622<br><br>(Super. Ct. No. CF91431622)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  John F. Vogt, Judge.

Elizabeth M. Campbell, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

In 1992, petitioner Lee Andrew Herns was convicted of first degree murder and attempted robbery by means of force and fear. On October 17, 2019, petitioner filed a petition for resentencing pursuant to Penal Code section 1172.6[1] (former § 1170.95).[2] The trial court conducted an evidentiary hearing and denied the petition.

Petitioner appealed. (*People v. Herns* (Sept. 28, 2022, F081400) [nonpub. opn.] (*Herns*).)[3] We "reverse[d] the order denying the petition for resentencing and remand[ed] the matter to the trial court for a new section 1172.6, subdivision (d)(3), hearing applying the correct standard of review . . . ." (*Ibid.*)

Subsequently, the trial court conducted a new evidentiary hearing. The court found beyond a reasonable doubt that petitioner was a major participant in the underlying felony and that he acted with reckless indifference to human life. Petitioner again appealed.

On appeal, petitioner argues that: (1) the evidence was insufficient to show that he was a major participant who acted with reckless indifference to human life; (2) the trial court erred because it failed to consider his youth and mental capacity; and (3) if petitioner forfeited his claim of error regarding the court's failure to consider his youth and mental capacity, trial counsel provided ineffective assistance. The People disagree.

We conclude substantial evidence exists to establish petitioner was a major participant who acted with reckless indifference to human life. Additionally, petitioner forfeited his claim that the trial court erred because it failed to consider his youth and

---

[1] Undesignated statutory references are to the Penal Code.

[2] Effective June 30, 2022, section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We refer to the current section 1172.6 in this opinion.

[3] On May 23, 2024, we granted petitioner's request for judicial notice of the record in *People v. Herns*, F081400.

And while we cite and quote our nonpublished opinion in *Herns*, our analysis does not rely on facts summarized in *Herns*. (See § 1172.6, subd. (d)(3).)

mental capacity, and his ineffective assistance of counsel claim fails. Accordingly, we affirm the court's denial of petitioner's section 1172.6 petition.

## PROCEDURAL HISTORY AND BACKGROUND

### I. Verdict and Sentencing

In *Herns*, we summarized the procedural background regarding the verdict and sentencing as follows:

> "On May 6, 1992, a jury found [petitioner] guilty of murder in the first degree. (Pen. Code, § 187.) The jury further found that, in the commission of the offense, [petitioner] was armed with a firearm (§ 12022, subd. (a)(1)), but found untrue an allegation that he committed the murder while engaged in the commission and attempted commission of an armed robbery, in violation of sections 664 and 211, within the meaning of section 190.2, former subdivision (a)(17)(i). The jury also found [petitioner] guilty of attempted robbery by means of force and fear (§§ 664, 211, 212.5, subd. (b)), with the same arming enhancement.

> "On June 15, 1992, the court imposed a term of 25 years to life for the murder conviction, with an additional one year for the firearm enhancement, and a concurrent term of three years on the robbery conviction." (*Herns*, *supra*, F081400, fn. omitted.)

### II. Section 1172.6 Petition and Prior Appeal

On October 17, 2019, petitioner filed a petition for resentencing under section 1172.6, alleging he was convicted of first degree murder under the felony-murder rule and could not now be convicted of first degree murder because of the changes to sections 188 and 189. The People opposed the petition, asserting "there are facts here supportive of [petitioner] being a major participant who acted with reckless indifference." The parties also disagreed on the burden of proof the prosecution bears during an evidentiary hearing conducted pursuant to section 1172.6, subdivision (d)(3).

The trial court held an evidentiary hearing. On June 29, 2020, the court found that petitioner was "a major participant who acted with reckless disregard to human life," and denied the petition.

On July 1, 2020, petitioner filed a notice of appeal. On appeal, the parties once again disagreed regarding the applicable burden standard of proof. (*Herns*, *supra*, F081400.) Based on a recent amendment to section 1172.6, our court found that "the prosecution's burden of proof at the evidentiary hearing is 'to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019.' " (*Ibid*.) Thus, the trial court was required to " 'act[] as an independent fact finder, to determine beyond a reasonable doubt whether [petitioner] is guilty of murder under a valid theory of murder.' " (*Ibid.*) As it was unclear whether the trial court applied this standard, our court "reverse[d] the [trial] court's order and remand[ed] for the . . . court to reconsider [petitioner's] eligibility for relief applying the correct legal standard." (*Ibid.*)

## III. New Evidentiary Hearing and Trial Court's Order

The trial court conducted the new evidentiary hearing on April 27, 2023. The prosecution argued the evidence showed that petitioner was a major participant in the crime and he acted with reckless indifference to human life. Petitioner argued that he was not a major participant and that he did not act with reckless indifference.

### A. Factual Background

The trial court admitted the preliminary hearing transcript (excluding Detective J. Chilberto's testimony), the change of plea transcript,[4] our opinion in *Herns* (for procedural background only), the first amended information, and the victim's death certificate.

In its written order, the trial court, relying on petitioner's counsel's statement of facts, summarized the facts as follows:

---

[4] It is not clear what change of plea transcript the trial court was referring to. There is no such transcript in the record, and both petitioner and his codefendant were convicted by a jury after a trial.

4.

"On July 1, 1990, at approximately 9:00 p.m., the victim went outside to fix the mailbox that was near the street. A [B]lack male approached the victim with an object in his hand and asked for money. The victim replied that he did not have any money and told his wife to call the police. The victim's wife, [Ms.] Lee,[5] only saw one man approach her husband. Ms. Lee went to call the police when she heard a shot. When she looked through the window she saw a person 'dying face up.' She went outside and saw that it was her husband. . . .

". . . Phelps testified that while he was at . . . Gray's house, [petitioner] and Herman Johnson [(the codefendant)] came over. Around 8:00 or 9:00 p.m., Gray, Phelps, [petitioner], and Johnson left the residence for Williams's house. They stayed at the house for approximately one or two hours. During that time, Phelps observed [petitioner] take a shotgun from his red duffel bag. He later saw Williams and Johnson take the twelve-gauge shotgun and cut it down from approximately 20 inches to between 12 and 15 inches. Phelps testified that Johnson gave the shotgun to [petitioner] and that [petitioner] placed i[t] inside his pants. However, Gray testified that [petitioner] had the gun in the red duffel bag and on his shoulders.

"Gray, Phelps, [petitioner,] and Johnson left Williams's house in the direction of the victim's house. The group stopped in front of the victim's house. [Petitioner] went up to the window of the victim's house and looked in the window. He returned to the group and said that they have a lot of money and 'what's up.' Johnson replied 'okay.' Phelps saw Johnson take the gun from [petitioner's] pants and 'load[] it up' with bullets obtained for [*sic*] [petitioner]. Phelps and Gray crossed the street toward the bus stop while [petitioner] and Johnson went up to the victim's house. Phelps later heard a gunshot. Phelps ran when he heard the gunshot. Johnson and [petitioner] caught up to him. [Petitioner] looked like he was ready to cry while Johnson had a grin on his face. Johnson was still holding the shotgun. Johnson broke the gun apart, a shell fell out, and he gave it back to [petitioner]. [Petitioner] placed the two pieces of the firearm inside his pants. Johnson asked [petitioner] 'why come [*sic*] he couldn't get the money' and [petitioner] replied that he was scared.

"The group walked to Johnson's grandmother's house. Only Johnson and [petitioner] went in and [they] returned without the firearm.

---

[5] For privacy, and pursuant to California Rules of Court, rule 8.90, we omit the full names of some persons. No disrespect is intended.

When the group returned to Gray's house, Johnson wanted to watch the news. Johnson stated that he shot the victim in the chest.

"At some point, Johnson told Phelps that the victim had a gun in his back pocket, but did not make any statements regarding whether or not the victim pulled the gun on him.

". . . Spencer testified . . . that Johnson told her that he wanted to watch the news because he had shot a Hmong person. When questioned by Spencer as to why, Johnson replied, 'Well, I had rather to [*sic*] shoot him than for him to shoot me.' " (Citations omitted.)

### B. The Trial Court's Ruling

On June 29, 2023, the trial court issued a written order. !(CT 123–137)! As to whether petitioner was a major participant, the trial court found as follows:

"The idea of robbery came to be through . . . [p]etitioner's observations of the victim, which were then shared with the [cod]efendant. Whether the decision to rob the victim was first articulated by either is unknown. But in short order they had an agreement to rob the victim, the plan was set in motion and carried out shortly thereafter.

"It is also clear that the shotgun used was known by all witnesses to belong to and be carried in a concealed carrier by . . . [p]etitioner prior to the robbery and that the [cod]efendant was allowed access to it. The [cod]efendant did in fact take control of the weapon as the robbery was being undertaken. The record also establishes that [p]etitioner furnished a live shell to the [cod]efendant after he had possession of the gun. There is no record of any more detailed interaction or discussion about this between . . . [p]etitioner and the [cod]efendant.

"We also know that there was an ongoing association between . . . [p]etitioner and the [cod]efendant prior to the robbery. We do not know how long or how in depth this association was. There is no evidence of any prior violent activity conducted by the two together, or that [p]etitioner was aware of prior violent conduct by the [cod]efendant.

"Beyond that, we can safely say that . . . [p]etitioner accompanied the [cod]efendant to the scene of the robbery, was present when the victim was challenged by the [cod]efendant and when the [cod]efendant shot the victim. We do not have any evidence of other specific actions or words of [p]etitioner except that he fled the scene immediately upon the victim being shot.

"From these facts, it is this [c]ourt's opinion that [p]etitioner initiated the idea of the robbery, actively joined in the plan to rob the victim, was responsible for the weapon being present, loaded and used, actively participated in the attempt to rob the victim and then fled once lethal force was used. Quite frankly the only reasonable conclusion is that . . . [p]etitioner was a 'Major Participant' in the robbery/attempted robbery."

As to whether petitioner acted with reckless indifference, the trial court found as follows:

"Evaluating the facts generally shows that [petitioner] ignored the obvious risk to life in confronting victim, supplying the gun and the one fatal round to the co-defendant. Common sense dictates that such behavior is fraught with risk and danger. This is especially true since [petitioner] targeted a vulnerable and isolated citizen, and while there was no explicit plan to leave the victim to languish after the shooting, that's what . . . [p]etitioner did.

". . . The evidence of record established that [the codefendant] shot the victim when he thought he was reaching for a gun himself. A loaded firearm was in fact found under the body of the deceased.

"The evidence does not show the planned robbery included a shooting of the victim as a necessary part of the robbery. [¶] . . . [¶]

"In this case, [p]etitioner . . . identified the victim for the robbery, was involved in the planning of the robbery with the co-defendant who he had known for some time, supplied the one firearm used in the robbery, supplied the one round of ammunition used in the killing, was personally present in the commission of the robbery and the shooting, and did nothing to intervene during the brief encounter before the victim was shot, and did not assist the victim after he was shot. In fact, he ran from the scene with the co-defendant.

". . . [T]his [c]ourt concludes that [p]etitioner . . . is too intricately involved and connected to the events to be granted relief. He qualifies as a [m]ajor [p]articipant who acted with [r]eckless [d]isregard for [h]uman [l]ife."

## IV.    Current Appeal

On July 25, 2023, petitioner timely filed a notice of appeal. On appeal, petitioner argues that substantial evidence did not support the trial court's finding the prosecution

7.

proved beyond a reasonable doubt that he was guilty of murder as a major participant who acted with reckless indifference to human life. Petitioner also argues that the court erred because it failed to consider his youth and his mental capacity when making its determination that he acted with reckless indifference. Finally, petitioner argues that if his argument regarding his youth and mental capacity was forfeited, trial counsel rendered ineffective assistance.

## DISCUSSION

**I.    Substantial Evidence Supports the Trial Court's Finding that Petitioner Was a Major Participant and Acted with Reckless Indifference**

### *A.  Section 1172.6 Procedure and Standard of Review*

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437) "altered the substantive law of murder in two areas." (*People v. Curiel* (2023) 15 Cal.5th 433, 448 (*Curiel*).) First, the bill "narrowed the scope of the felony-murder rule so that a 'participant in the perpetration or attempted perpetration of a [specified felony] in which a death occurs' can be liable for murder only if '[t]he person was the actual killer'; '[t]he person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree'; or '[t]he person was a major participant in the underlying felony and acted with reckless indifference to human life.' " (*People v. Arellano* (2024) 16 Cal.5th 457, 467–468, quoting § 189, subd. (e)(1)–(3).) Second, the bill "eliminate[d] liability for murder as an aider and abettor under the natural and probable consequences doctrine" by requiring that, "except in cases of felony murder, 'a principal in a crime shall act with malice aforethought' to be convicted of murder." (*Curiel*, at p. 449, quoting § 188, subd. (a)(3).) Now, " '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' " (*Curiel*, at p. 449.)

8.

Additionally, Senate Bill No. 1437 added former section 1170.95, now section 1172.6, to provide a procedure for those convicted of a qualifying offense " 'to seek relief' where the two substantive changes described above affect a defendant's conviction." (*Curiel*, *supra*, 15 Cal.5th at p. 449.)  Under section 1172.6, an offender seeking resentencing must first file a petition in the sentencing court, and the sentencing court must determine whether the petitioner has made a prima facie showing that he or she is entitled to relief.  (§ 1172.6, subds. (a)–(c); accord, *People v. Strong* (2022) 13 Cal.5th 698, 708.)  If the sentencing court determines the petitioner has made a prima facie showing, the court must issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction.  (§ 1172.6, subds. (c), (d)(1).)

At this evidentiary hearing, "the burden of proof [is] on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)  "The admission of evidence in the hearing [is] governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed.  The court may also consider the procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3).)

"Ordinarily, a trial court's denial of a section 1172.6 petition [following an evidentiary hearing] is reviewed for substantial evidence.  [Citation.]  Under this standard, we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).)

9.

### B. Applicable Law Regarding Felony Murder

Since the passage of Senate Bill No. 1437, section 189, subdivision (e)(3) provides that a participant in a qualifying felony where a death occurs may be liable for murder if the person was "a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." Relatedly, section 190.2 "identifies the circumstances under which murderers and accomplices can be punished by death or life imprisonment without parole. . . . For defendants who did not kill and lacked intent to kill, section 190.2, subdivision (d) permits such punishment only if they acted 'with reckless indifference to human life and as a major participant' [in] a qualifying felony like robbery." (*People v. Douglas* (2020) 56 Cal.App.5th 1, 7; see *In re Scoggins* (2020) 9 Cal.5th 667, 674 (*Scoggins*).)

In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), our Supreme Court sought to clarify the circumstances under which "an accomplice who lacks the intent to kill may qualify as a major participant so as to be statutorily eligible for the death penalty." (*Id*. at p. 794.) Our high court identified the following nonexhaustive factors as relevant to this inquiry: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id*. at p. 803, fn. omitted.) However, "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid*.)

The following year, in *People v. Clark* (2016) 63 Cal.4th 522, 614–623 (*Clark*), our high court addressed the "reckless indifference" standard. The court explained that reckless indifference to human life "encompasses a willingness to kill (or to assist another

10.

in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.) The court further explained that reckless indifference has both a subjective and an objective component. (*Ibid.*) Subjectively, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks*, *supra*, 61 Cal.4th at p. 801; accord, *Clark*, at p. 617.) Objectively, " '[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " (*Clark*, at p. 617.) That a felony involves a gun is insufficient, by itself, to support a finding of reckless indifference. (*Id*. at pp. 617–618.)

In *Clark*, our high court provided the following nonexhaustive list of factors to be considered in determining whether the defendant acted with reckless indifference: (1) knowledge of weapons, and use and number of weapons; (2) physical presence at the crime and opportunities to restrain the crime and/or aid the victim; (3) duration of the felony and period of interaction between the perpetrators and the victims; (4) the defendant's knowledge of his or her cohort's likelihood of killing, and (5) the defendant's efforts to minimize the risk of violence during the felony. (*Clark*, *supra*, 63 Cal.4th at pp. 618–623.) Like the factors considered in *Banks*, " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, at p. 618.)

Notably, *Banks* and *Clark* derived their holdings from *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) and *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), prevailing Eighth Amendment cases regarding the circumstances under which the death penalty permissibly may be imposed for felony murder. (*In re Ramirez* (2019) 32 Cal.App.5th 384, 393.) Our Supreme Court has explained that *Enmund* and *Tison* together establish a " 'spectrum of culpability,' " with felony murderers who " 'actually killed, attempted to

11.

kill, or intended to kill' " at one end, and minor actors who were not present on the scene and had no culpable mental state at the other. (*Scoggins*, *supra*, 9 Cal.5th at p. 675.) We briefly describe the facts of *Enmund* and *Tison* to give context to this spectrum.

The defendant in *Enmund* was a getaway driver for a robbery. He sat waiting in his parked car a few hundred feet away from the home where his two confederates fatally shot an elderly couple when they resisted. (*Enmund*, *supra*, 458 U.S. at pp. 784, 788.) The high court emphasized the defendant "did not kill or attempt to kill," and the record did not support a finding he "had any intention of participating in or facilitating a murder." (*Enmund*, at p. 798.) As such, imposition of the death penalty, which must be based solely on a defendant's own culpability, was constitutionally disproportionate. (*Ibid*.)

The facts of *Tison* are starkly different. There, three brothers helped their father and his cellmate—both convicted murderers—escape from prison, arming the prisoners during their escape. (*Tison*, *supra*, 481 U.S. at pp. 139, 150–152.) When the group eventually experienced car trouble, one of the brothers flagged down a passing car for help while the other men laid in wait by the side of the road. (*Id.* at pp. 139–140.) The group then kidnapped at gunpoint a family of four in a passing car, robbed them, and drove them into the desert. (*Id.* at p. 140.) The brothers stood by while their father and his cellmate shot the victims repeatedly. (*Id.* at pp. 140–141.) The group then drove off in the family's car. (*Ibid*.) Two of the brothers were convicted of the four murders and sentenced to death.[6] (*Tison*, at pp. 141–143.) On appeal, the high court emphasized that "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment

---

[6] The third brother was killed during a shootout with police. (*Tison*, *supra*, 481 U.S. at p. 141.)

12.

when that conduct causes its natural, though also not inevitable, lethal result." (*Id.* at pp. 157–158.)  The high court noted the brothers' major participation in the kidnapping and robbery implicated them in the resulting deaths, and the death penalty could properly be imposed under such circumstances where the defendants also exhibited reckless indifference to human life.  (*Id.* at p. 158.)

Our Supreme Court has explained that, "[s]omewhere between [*Tison* and *Enmund*], at conduct less egregious than the Tisons' but more culpable than . . . Enmund's, lies the constitutional minimum for death eligibility." (*Banks*, *supra*, 61 Cal.4th at p. 802.)

### C.  Analysis

#### i.    Substantial Evidence Supports the Finding that Petitioner Was a Major Participant

Substantial evidence of several *Banks* factors supports the trial court's determination that petitioner was a major participant in the attempted robbery.

We acknowledge that some of the *Banks* factors are not present in this case.  There is no evidence that petitioner knew Johnson was prone to violence.  Additionally, given the brevity of the attempted robbery and that Johnson shot the victim because he believed the victim was reaching for a firearm, it does not appear that petitioner was in a position to prevent the actual murder, and his actions during the attempted robbery did not play a particular role in the victim's death.  Finally, there is no evidence that petitioner personally used a firearm during the attempted robbery.

However, despite the absence of evidence on the foregoing, the factors that are present are sufficient to establish petitioner's role as a major participant in the offense.  Most of the evidence before the trial court came from the preliminary hearing transcript.  At the preliminary hearing, there was testimony that petitioner had a role in planning the attempted robbery.  He left the group, looked through the window of the victim's house, and then told Johnson that "they got a whole lot of money."  Additionally, there was

13.

testimony that he supplied the weapon and the ammunition that was used during the attempted robbery. As the ammunition was supplied just prior to the robbery, petitioner knew that Johnson was armed with a loaded firearm. Finally, there is testimony that petitioner was present at the scene of the killing, and rather than rendering aid after Johnson shot the victim, petitioner fled.

Although the duration of the offense was brief, it is significant that petitioner located the target of the robbery, provided the weapon, provided the ammunition, was present at the scene, and fled instead of attempting to aid to the victim.

The foregoing evidence is sufficient to support the trial court's finding that petitioner was a major participant in the underlying attempted robbery that led to the victim's death.

Petitioner's arguments to the contrary rely largely on a misapplication of the relevant legal standard. For example, petitioner argues, "that contrary to the court's finding that [petitioner] had 'supplied' the weapon and the bullet, . . . Johnson had claimed ownership of both." It is true that Gray testified Johnson told him the firearm belonged to Johnson (although there is no evidence that Johnson claimed ownership over the ammunition). However, Gray also testified that petitioner stated he purchased the firearm, and Phelps testified that petitioner stated petitioner found the firearm. More importantly, both Phelps and Gray testified that it was petitioner who brought the firearm on the day of the incident, and that it was petitioner who was carrying the firearm and the ammunition right before the attempted robbery. Given this evidence, even assuming petitioner is correct that some evidence suggests that he did not supply the weapon and the ammunition, substantial evidence supports the trial court's ruling. (*Reyes*, *supra*, 14 Cal.5th at p. 988 ["we review the record ' " 'in the light most favorable to the judgment below' " ' "].)

Petitioner also argues that "the evidence shows that [petitioner's] participation was largely limited to following the lead of Johnson and doing what he was told." However,

while Gray did testify that petitioner would follow Johnson wherever he went, Gray also testified that he never observed Johnson giving orders to petitioner, and that he did not hear Johnson tell petitioner to carry the weapon and ammunition for him. There is no evidence in the record suggesting that petitioner was acting pursuant to Johnson's "orders" on the day in question. Again, when reviewing the record for substantial evidence, we review the record in the light most favorable to the judgment. (*Reyes*, *supra*, 14 Cal.5th at p. 988.)

In conclusion, while petitioner is correct that there is some conflicting evidence, we review the record in the light most favorable to the judgment. (*Reyes*, *supra*, 14 Cal.5th at p. 988.) Moreover, no evidence conflicts with the court's finding that petitioner fled instead of attempting to render aid. Thus, substantial evidence supports the trial court's finding.

### *ii.* Substantial Evidence Supports the Finding that Petitioner Acted with Reckless Indifference to Human Life

There is substantial overlap between the evidence supporting the trial court's major participation finding and its reckless indifference finding. As with the *Banks* factors, some of the *Clark* factors are not supported by the evidence. Specifically, it does not appear petitioner had an opportunity to prevent the killing during the brief interaction between Johnson and the victim. And, again, the evidence does not suggest petitioner was aware that Johnson was prone to violence. Finally, there is no evidence that petitioner personally used a firearm during the attempted robbery.

However, petitioner made no effort to minimize the risk of violence prior to or during the attempted robbery. In fact, he knew that Johnson had a loaded firearm because he supplied both the firearm and the ammunition mere moments before the shooting. Moreover, rather than attempting to render aid to the victim, he fled immediately after the shooting.

15.

In sum, substantial evidence supports the trial court's finding that petitioner acted with reckless indifference to human life.[7] (*Clark*, *supra*, 63 Cal.4th at pp. 618–623.)

## II. Petitioner Forfeited His Claim that the Trial Court Erred Because It Failed To Consider His Youth and Mental Capacity

### A. Applicable Law

"The forfeiture doctrine is a 'well-established procedural principle that, with certain exceptions, an appellate court will not consider claims of error that could have been—but were not—raised in the trial court. [Citation.]' [Citations.] Strong policy reasons support this rule: 'It is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided. [Citations.]' [Citation.] ' " ' "The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal." ' " [Citation.]' " (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114; accord, *People v. Salazar* (2016) 63 Cal.4th 214, 239–240; *People v. French* (2008) 43 Cal.4th 36, 46.)

---

[7] In his reply brief, petitioner argues that the evidence of his mental state after the shooting "strongly suggests that [he] was shocked and upset by the shooting – a mental state antithetical to reckless indifference." According to petitioner, "Phelps testified that [petitioner] was scared and that he looked like he was going to cry," and Gray testified that while Johnson laughed after the shooting, petitioner did not. Additionally, petitioner argues there is evidence that petitioner did not take the victim's gun because he was scared.

While petitioner's recitation of the evidence is correct, Phelps also testified that petitioner appeared to be happy after the shooting. There is thus conflicting evidence regarding petitioner's demeanor after the shooting, and on appeal we review the record in the light most favorable to the judgment. (*Reyes*, *supra*, 14 Cal.5th at p. 988.) More importantly, the trial court reasonably concluded the evidence that petitioner ran immediately after the shooting (instead of attempting to aid the victim) supports a finding that he acted with reckless indifference.

### B. *Analysis*

Petitioner argues that the trial court failed to consider evidence related to his youth and mental status, including a psychiatric examination prepared by Dr. Howard Terrell in 1991 that was conducted to determine whether petitioner was competent to stand trial and a psychological evaluation prepared by Dr. Donna Snow in 2021 that was conducted for his youthful offender parole hearing. According to petitioner, this evidence shows that he "was in special education classes all through school and had an IQ in the 'low average to mildly retarded range.' The report for the youthful offender hearing identified 'below average cognitive abilities' characterized by difficulties in abstract thinking. That report summarized tests placing [petitioner] in the third percentile for overall intelligence." (Citations omitted.)

While petitioner is correct that the trial court did not consider evidence related to his youth or mental capacity, the reason appears to be because petitioner did not present this evidence to the court. Prior to the evidentiary hearing, petitioner submitted an updated hearing brief. The brief made no mention of petitioner's age or mental capacity. Moreover, prior to the evidentiary hearing, and at the evidentiary hearing, the parties discussed the evidence the prosecution intended to present. While petitioner objected to certain portions of the prosecution's evidence, he did not ask the court to consider any evidence related to his age or mental capacity. Finally, at the hearing, petitioner did not make any arguments regarding his youth or mental capacity.

As petitioner did not present any evidence or make any arguments regarding his youth or mental status at the evidentiary hearing, he forfeited this claim.

## III. Petitioner's Ineffective Assistance of Counsel Claim Fails

### A. *Applicable Law*

Petitioner has the burden of proving ineffective assistance of counsel. (*People v. Pope* (1979) 23 Cal.3d 412, 425, overruled on other grounds in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.) To establish such a claim, he must show (1) his

counsel's performance fell below an objective standard of reasonableness and (2) prejudice, that is, but for counsel's unprofessional error a different result would have been reasonably probable. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.) "Because of the difficulties inherent in making the evaluation [of counsel's performance], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Id*. at p. 689.)

"It is . . . particularly difficult to establish ineffective assistance of counsel on direct appeal, where we are limited to evaluating the appellate record. If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.) Reversal is permitted " 'only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' " (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.)

### B.  Analysis

Petitioner argues that defense counsel's failure to raise his mental capacity and youth constitutes ineffective assistance of counsel. We address defense counsel's failure to raise mental capacity and youth separately, starting with mental capacity.

According to petitioner, the report of Dr. Terrell and the report of Dr. Snow were already in the court's records, but defense counsel failed to make the appropriate legal arguments regarding petitioner's mental capacity based on these reports. This claim fails

18.

on direct appeal.  We do not know why defense counsel failed to ask the trial court to consider, or make arguments regarding, these reports, and there are potential satisfactory explanations.  One such explanation is that defense counsel did not ask the trial court to consider the reports because they are not entirely favorable, and she did not want to open the door to the admission of unfavorable evidence regarding petitioner's mental capacity.  For example, Dr. Snow's report stated that petitioner was "diagnosed with Antisocial Personality Disorder due to evidence of a pervasive pattern of disregard for and violation of the rights of others, occurring since adolescence and continuing into adulthood."  Whether right or wrong, trial counsel may have reasonably concluded that this and other information in the reports would have hurt her arguments regarding reckless indifference more than it would have helped.[8]

As to the failure to present facts or make arguments regarding petitioner's age at the time of the incident, even assuming error, petitioner fails to show prejudice.  First, petitioner was 20 years old at the time of the incident.  "Presumably, the presumption of immaturity weakens as a defendant approaches 26." (*People v. Oliver* (2023) 90 Cal.App.5th 466, 489.)

"More importantly, however, the case law discussing the differences in brain development among youthful offenders (in contrast to their adult counterparts) stress two areas of divergence:  (1) their relative impulsivity; and (2) their vulnerability to peer pressure." (*People v. Oliver*, *supra*, 90 Cal.App.5th at p. 489.)  And based on the trial court's factual findings, there is little to no evidence that the criminal behavior at issue here was influenced by either factor.  Rather than the robbery being an impulsive act,

---

[8] Petitioner argues that the reports were already in the record, so counsel only needed to bring the legal importance of the reports to the trial court's attention.  However, as discussed above, the prosecution did not ask the trial court to consider these reports, the trial court never indicated it was going to consider these reports, and defense counsel may have reasonably concluded it was in her client's best interest for the trial court not to consider the information contained in the reports.

petitioner brought and carried ammunition, brought and carried a concealed firearm, reconnoitered the potential robbery target, and "targeted a vulnerable and isolated citizen." Moreover, rather than petitioner being influenced by Johnson, it was petitioner who "initiated the idea of the robbery" and "was responsible for the weapon being present, loaded and used."

Accordingly, based on the factual record before us on appeal, the differences in brain development between youthful offenders and their adult counterparts played little to no role. Thus, even if defense counsel had raised arguments concerning petitioner's age, a different result is not reasonably probable, and his ineffective assistance of counsel claim fails.

## DISPOSITION

The judgment is affirmed.


DETJEN, Acting P. J.

WE CONCUR:


MEEHAN, J.


SNAUFFER, J.

20.